1  BRIAN J. STRETCH (CABN 163973)
   United States Attorney

2

   BARBARA J. VALLIERE (DCBN 439353)
3  Chief, Criminal Division

4  WILLIAM FRENTZEN (LABN 24421)
   SUSAN E. BADGER (CABN 124365)
5  S. WAQAR HASIB (CABN 234818)
   Assistant United States Attorneys

6
        450 Golden Gate Avenue, Box 36055
7       San Francisco, California 94102-3495
        Telephone: (415) 436-7200
8       FAX: (415) 436-7234
        william.frentzen@usdoj.gov
9       susan.badger@usdoj.gov
        waqar.hasib@usdoj.gov
10
   Attorneys for United States of America
11

                   UNITED STATES DISTRICT COURT
12

                  NORTHERN DISTRICT OF CALIFORNIA
13

                     SAN FRANCISCO DIVISION
14

15  UNITED STATES OF AMERICA,            )  No.:  CR 14-0196 CRB
                                         )
16      v.                               )  UNITED STATES' MEMORANDUM OF LAW
                                         )  AND STATEMENT REGARDING RELATIVE
17  KWOK CHEUNG CHOW, et. al.,           )  CULPABILITY OF DEFENDANTS TO BE
                                         )  SENTENCED ON JANUARY 8, 2018
18      Defendants.                      )
                                         )  Court:   Honorable Charles R. Breyer
19                                       )  Date:  January 8, 2018
                                         )  Time:  10:00 a.m.
20                                       )
                                         )
21  _____)

22

23

24

25

26

27

28

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

PROCEDURAL HISTORY.....................................................................................................1

DISCUSSION ..........................................................................................................................3

    A.    Defendants Can Be Held Responsible at Sentencing For Conduct To Which They Have Not Pled Guilty..........................................................................................3

    B.    Defendants Can Be Held Responsible for Conduct That Was Within the Scope of the Racketeering Conspiracy, In Furtherance of that Conspiracy, and Reasonably Foreseeable ...............................................................................................4

    C.    Relative Culpability of Defendants.........................................................................7

    D.    Downward Variances Recommended by the Probation Officer .......................................11

# TABLE OF AUTHORITIES

## Federal Cases

*United States v. Barragan*, 871 F.3d  (9th Cir. 2017)....................................................... 5, 6, 7, 13

*United States v. Fine*, 975 F.2d 596 (9th Cir. 1992)............................................................ 3, 4

*United States v. Lloyd*, 807 F.3d 1128 (9th Cir. 2015) ........................................................ 7

*United States v. Massino*, 546 F.3d 123 (2d Cir. 2008)...................................................... 6

*United States v. Mercado*, 474 F.3d 654 (9th Cir. 2007)..................................................... 3

*United States v. Torres*, 81 F.3d 900 (9th Cir. 1996)........................................................... 7

*United States v. Treadwell*, 593 F.3d 990 (9th Cir. 2010) .................................................... 7

*United States v. Wong*, 2 F.3d 927 (9th Cir. 1993) ............................................................. 4

*United States v. Zemek*, 634 F.2d 1159 (9th Cir. 1980)....................................................... 5

## Federal Statutes

18 U.S.C. § 3553(a) ........................................................................................................... 1, 11

## Federal Rules

U.S.S.G. § 1B1.2(d) ........................................................................................................... 7

U.S.S.G. § 1B1.3(a)(1)(B) ................................................................................................. 4

## INTRODUCTION

Nine defendants in the above-referenced case are scheduled to be sentenced by this Court on January 8, 2018.  Six of those nine defendants pled guilty to numerous substantive charges against them, but not to the racketeering conspiracy in which they are each named, leaving that charge open and pending.  Those six defendants entered their guilty pleas without a plea agreement with the United States.

The United States hereby submits this memorandum of law as to those six defendants, addressing the legal principles establishing why evidence of the RICO charge against each should be included for each defendant as relevant conduct for sentencing purposes.  The United States also addresses the relative culpability of those six defendants, as well as the three additional co-defendants scheduled for sentencing on January 8, 2018 (Tina LIANG, who was charged in the racketeering conspiracy but pled guilty pursuant to a plea agreement, and Rinn ROUEN and Barry HOUSE, who were not charged in the racketeering count).  Finally, the government discusses the across-the-board variances recommended by the Probation Office.

The United States will supplement this memorandum of law with separate sentencing memoranda for each of the nine defendants, addressing their particularized offense conduct and individually relevant factors under 18 U.S.C. § 3553(a), as well as the government's sentencing recommendation for each defendant.

## PROCEDURAL HISTORY

The Court by now is well acquainted with the procedural history of this complicated, multi-defendant racketeering case, so the government below recites only those facts that are salient to the upcoming January 8, 2018, sentencing hearing.

On January 29, 2015, the grand jury returned the Second Superseding Indictment in this case, charging seventeen individuals with conspiring to conduct the affairs of an enterprise, the Chee Kung Tong, or CKT, through a pattern of racketeering activity.  *See*, Count One of the Second Superseding indictment.  The indictment also charged the defendants with numerous substantive counts involving money laundering, drug trafficking, trafficking in stolen liquor, firearms trafficking, murder for hire, and a host of other offenses.  Six of the defendants charged in the Count One RICO conspiracy pled guilty

without a plea agreement to certain substantive counts selected by each defendant.[1]  They did not plead guilty to the Count One RICO and as to each, that charge remains outstanding.

At the September 9, 2015 hearing, the Court had this to say about the pending racketeering charge during their plea colloquies:

> First, the Court does not have the power to simply dismiss a remaining charge, and the issue here that I want to discuss is what happens when in fact you enter a plea of guilty to some but not all charges, what happens to the other charges?  That's the question.  And I want you to understand that as to any charge to which you are not entering a plea of guilty today, that charge remains pending against you, and the Government has the right, in the exercise of its discretion, to determine whether to try that charge… or whether to dismiss that charge.  That's the power of the executive.  It doesn't rest with the Court.  So that charge remains outstanding and pending against you.  That's number one.
>
> Number two, you should be aware that any statements that you make in connection with your plea of guilty to any of the charges today or in any presentence report can be used by the Government against you in connection with any pending criminal charge, so that remains an issue that you have to understand is still a matter that may be of concern to you.
>
> Third, the Court can consider evidence of charges to which you have not pled guilty in connection with sentencing… on charges to which you have pled guilty, if those charges are deemed to be relevant conduct.  That is to say if the evidence supporting the other charges, charges to which you have not pled guilty, the Court has the power to consider that evidence in terms of sentencing.

Transcript, September 9, 2015, pgs. 12-13.

On October 15, 2015, a Third Superseding Indictment was returned, charging one defendant, Kwok Cheung CHOW, with the same CKT racketeering conspiracy that was charged in Count One of the Second Superseding Indictment, but adding one count of murder in aid of racketeering (the Allen Leung murder), and one count of conspiracy to commit murder in aid of racketeering (the unconsummated plot to murder Jim Tat Kong).  The Third Superseding Indictment also repeated many of the substantive counts of money laundering and other offenses that were in the Second Superseding Indictment.

In November 2015, CHOW went to trial on the charges in the Third Superseding Indictment.

---

[1] Defendants George NIEH, Leslie YUN, James PAU, and Kevin SIU pled guilty on September 9, 2015.  Defendant Michael MEI pled guilty on May 4, 2016.  Defendant Elaine LIANG (no relation to defendants Tina LIANG and Jane LIANG) pled guilty on January 4, 2017.

During that trial, the government presented voluminous evidence establishing the existence and illegal activities of the CKT racketeering conspiracy, including evidence that each of the seven soon-to-be-sentenced Count One RICO defendants directly and personally participated with CHOW in conducting the affairs of the enterprise.  The specific evidence presented at trial relating to each defendant's role in the CKT enterprise will be discussed in further detail in the government's individualized sentencing memoranda.  For present purposes, it suffices to say that CHOW was convicted of the CKT racketeering conspiracy and every other charge against him, including the two murder charges.

## DISCUSSION

The government files this memorandum of law to address legal principles and other matters relevant to the upcoming January 8, 2018, sentencings: i) defendants can generally be held responsible for conduct to which they have not pled guilty; ii) the defendants here can therefore be held responsible for conduct that was within the scope of the racketeering conspiracy, in furtherance of that conspiracy, and reasonably foreseeable; iii) the defendants' culpability relative to each other; and iv) the government's position that across-the-board downward variances for all defendants is not appropriate.

### A.  Defendants Can Be Held Responsible at Sentencing For Conduct To Which They Have Not Pled Guilty

The first legal principle to address is a seemingly incontrovertible one: defendants can generally be held responsible at sentencing for conduct to which they have not plead guilty.  It is a principle that bears repeating nonetheless, as it is one that the defendants here have refused to accept, in spite of this Court's warnings, and in spite of the overwhelming case law bearing heavily against the defendants.  On September 9, 2015, when several of the Count One RICO defendants entered their guilty pleas, the Court warned them that it "can consider evidence of charges to which you have not pled guilty in connection with sentencing."  Transcript, September 9, 2015, pg. 13.   This was an accurate statement of the law.  It is well-established that relevant conduct for sentencing purposes can include conduct that is uncharged, conduct for which charges have been dismissed, and even conduct for which a jury has acquitted a defendant.  *See, e.g., United States v. Mercado*, 474 F.3d 654 (9th Cir. 2007)(holding that sentencing court can consider conduct for which a jury acquitted); *United States v. Fine*, 975 F.2d 596 (9th Cir. 1992)(holding that sentencing court can consider conduct for which the government has

1  dismissed charges pursuant to a plea agreement); *United States v. Wong*, 2 F.3d 927 (9th Cir.

2  1993)(citing *Fine,* holding that sentencing judge may take into account offenses to which defendant has

3  not pled guilty).

4      This Court was even more explicit during a status conference earlier this year, held after the

5  defendants sent the government a letter contesting the inclusion of the pending racketeering conspiracy

6  as relevant conduct.  At that status conference, the Court unambiguously said that the defendants'

7  position was "completely erroneous as a matter of law."  Transcript, May 4, 2017, at pg. 9.  The Court is

8  correct.  It is completely erroneous as a matter of law for the defendants to pick some offenses and admit

9  guilt, and then escape culpability for all the rest of their offense conduct.  As the government has stated

10  on previous occasions, the indictment in this case is not a lunch buffet.  If it was, then presumably

11  defendants would routinely plead guilty to lesser charges in order to avoid being sentenced for more

12  serious ones.

13      **B.**    **Defendants Can Be Held Responsible for Conduct That Was Within the Scope of**

14              **the Racketeering Conspiracy, In Furtherance of that Conspiracy, and Reasonably Foreseeable**

15      Moving from the general principle that defendants can be held responsible for conduct to which

16  they have not pled guilty, the next question is which conduct and how much of that conduct should be

17  attributable to each defendant.  Under Section 1B1.3 of the Sentencing Guidelines, in the case of a

18  jointly undertaken criminal activity such as the CKT racketeering enterprise, a defendant is responsible

19  for all acts of others that were i) within the scope of the jointly undertaken activity, ii) in furtherance of

20  that criminal activity, and iii) reasonably foreseeable in connection with that criminal activity.  U.S.S.G.

21  § 1B1.3(a)(1)(B).

22      Mindful of these limitations set forth in Section 1B1.3, the government in this case has

23  deliberately avoided employing a one-size-fits-all approach to sentencing wherein each defendant

24  should be held accountable for every racketeering act engaged in by the CKT enterprise.  To the

25  contrary, the government has endeavored in its sentencing memoranda to tailor an individualized

26  assessment for each defendant's responsibility for the conduct of other members of the enterprise.  The

27  starting place for this individualized assessment is setting forth the evidence that establishes, by a

28  preponderance of the evidence, that the defendant was a knowing participant in the affairs of the CKT

enterprise.  The government discusses that evidence in the individual sentencing memorandum for each defendant.

Having established that each of the six defendants was a participant in the affairs of the criminal enterprise, the government then analyzes the relevant conduct for which each defendant should be held accountable by (1) determining the scope of the criminal activity that the defendant agreed to jointly undertake; and (2) analyzing what conduct of others, within the scope of jointly undertaken activity, was reasonably foreseeable to the defendant.  See, § 1B1.3, App.N.3

The Ninth Circuit recently endorsed this approach in *United States v. Barragan*, 871 F.3d 698 (9th Cir. 2017), a case involving a RICO conspiracy.  On appeal, the defendants argued that the district court erred in attributing to them predicate acts on which they were not formally charged, were acquitted, or the jury did not convict.  The Court rejected that argument noting that "[l]ike our sister circuits, we have held that district courts may consider criminal conduct that the jury did not find – indeed, even conduct for which the jury acquitted – in setting the offense level for RICO sentences."  *Id.* at 716, citations omitted.

The Court further held that "the offense level for a racketeering conspiracy conviction may depend on which predicate acts were reasonably foreseeable and attributable to a defendant."  *Id.* at 715. In upholding the district court's relevant conduct determinations, the Ninth Circuit declined to adopt the narrow interpretation of  "scope of criminal activity" urged by the defendants.  The Court stated that the focus must be on "the underlying racketeering activity," which is "also known as predicate acts."  *Id.* The Court accordingly declined to adopt an analysis restricting a racketeering conspirator's relevant conduct liability to only the particular scheme or conspiracy in which the defendant personally participated.  The Court stated that that analysis, which is used in determining relevant conduct in multi-object conspiracies, is inapplicable to doing so in the case of a racketeering conspiracy.  *Id.* at 717.  The Court pointed out that "RICO conspiracies are of the single-object variety, with the object being to engage in racketeering.  The predicate racketeering acts are not, in themselves, conspiratorial objects." *Id.* at 717.  *Also see*, *United States v. Zemek*, 634 F.2d 1159, 1170 n.15 (9th Cir. 1980)("The essence of a RICO conspiracy is not an agreement to commit predicate crimes but an agreement to conduct or participate in the conduct of the affairs of an enterprise through a pattern of racketeering."); *United*

*States v. Massino*, 546 F.3d 123, 135 (2d Cir. 2008)("[a] RICO conspiracy is a single-object conspiracy, with the object being to engage in racketeering; predicate racketeering acts are not conspiratorial objects.")

The government has applied these principles in this case in determining relevant conduct for each of the six soon-to-be-sentenced defendants who are charged in the RICO conspiracy.  As set forth in the evidence recited in the sentencing memoranda, each defendant was a participant in the CKT enterprise.  Having established that, and following the rule that the single object of the enterprise was to engage in a pattern of racketeering activity, the relevant inquiry as to scope then focuses on the nature of the criminal activity each defendant elected to engage in as part of the enterprise.  In other words, the defendant conspired to engage in a single-object conspiracy – a conspiracy to conduct the affairs of the CKT enterprise through a pattern of racketeering activity; the defendant did not join a conspiracy in order to conduct a specific crime.  That is what *Barragan* stands for.  Otherwise, the RICO statute and the legal concepts underlying that statute such as enterprise, association-in-fact, and member liability for the acts of other members of the enterprise would be meaningless.  RICO conspirators would only be held accountable for only the limited activity in which that member personally engaged.  Clearly, that is not the law.

As an example of how that plays out in the instant case, if a particular defendant participated in the CKT  enterprise and engaged in money laundering activity, then the scope of that defendant's underlying enterprise activity is money laundering.  That is what the defendant agreed to do as part of the enterprise.  He or she may not have agreed to engage in other acts, such as murder or trafficking in stolen liquor or cigarettes.  But in participating in the enterprise and furthering the enterprise – including by reinforcing Chow's power and leadership position – by engaging in money laundering, then any other money laundering activity by other members of the enterprise that was reasonably foreseeable to that defendant is relevant conduct as to that defendant.  That is particularly true when, as in all of the cases here, defendants were aware that there were other individuals engaging in such activity as part of the enterprise.

What is clear under § 1B1.3(a)(1)(B) and *Barragan* is that the defendant's relevant conduct is not necessarily limited to only that activity in which he or she personally engaged or even to that of the

narrow conspiracy in which he or she took part.  *Cf. United States v. Lloyd*, 807 F.3d 1128, 1142-43 (9th Cir. 2015)(limiting the scope of jointly undertaken criminal activity in a conspiracy case that does not involve a RICO criminal enterprise).  This approach ensures that each defendant is fairly held responsible for conspiring to engage in the affairs of the CKT enterprise, but is not unfairly held responsible for conduct that occurred outside the scope of that defendant's role in that enterprise.

In *Barragan*, the Ninth Circuit also addressed the standard of proof the trial court must utilize when finding facts at sentencing in a RICO case.  For starters, the Court rejected the argument, based on U.S.S.G. § 1B1.2(d), that the sentencing court must apply a beyond-a-reasonable-doubt standard in finding facts pertaining to sentencing.  *Barragan*, *supra*, 871 F.3d at 717.  In finding that the appropriate standard of proof is preponderance of evidence, the Court also addressed and rejected the argument that in instances where a disproportionate sentence results from a finding of fact relevant to sentencing, the court must necessarily employ the clear and convincing standard of proof.  The Court noted that "the clear-and-convincing standard depends on the totality of the circumstances, which include … whether the increase in sentence is based on the extent of the conspiracy."  *Id. citing United States v. Treadwell*, 593 F.3d 990, 1000 (9th Cir. 2010).  The *Barragan* Court found that in a RICO case, this provision works against the application of the clear and convincing standard because, in most such cases, the increase in the sentence for RICO defendants is often based on a finding relating to the extent of the conspiracy.  The Court stated, "[w]e have repeatedly held that sentencing determinations relating to the extent of a criminal conspiracy need not be established by clear and convincing evidence."  *Barragan*, at 718, *citing Treadwell* at 1000.  *Also see, United States v. Torres*, 81 F.3d 900, 903 (9th Cir. 1996)("[t]he Government bears the burden of proving factors enhancing a sentence by a preponderance of the evidence.")

### C.    Relative Culpability of Defendants

The Court will recall that during trial, the government likened lead defendant Kwok Cheung CHOW to the sun at the center of the solar system, with the other CKT enterprise members revolving around him like planets.  CHOW himself used this analogy in titling his autobiography "Sun of the Underworld."  That same analogy may help the Court when assessing each defendant's relative culpability.  Relative culpability in this case is based on the nature and scope of each defendant's

1   criminal activities, as well as that defendant's relationship to CHOW, with those who orbited closely

2   around CHOW being most culpable from a racketeering perspective.

3       In that vein, co-defendant George NIEH is plainly the most culpable – he was CHOW's right-

4   hand man, his driver, he attended virtually every meeting between CHOW and undercover agents, and

5   he participated in the full range of the CKT enterprise's criminal activity.  At one point, NIEH told UCE

6   4599 "I tell the Old Man [referring to CHOW] everything; everything we've done.  I tell him about

7   every deal we've ever done.  CHOW Trial Transcript, v. 11, at 1626.  When NIEH's car was searched

8   on March 26, 2014, agents recovered a Beretta pistol and magazine from the console, along with indicia

9   relating to the CKT.  In addition, at one point towards the end of the investigation, after CHOW had a

10  falling-out with co-defendant Andy LI, CHOW asked NIEH to "pop" LI, meaning shoot him. Trial

11  Transcript, v. 12, at 1626-1628.  Although LI was never murdered and ultimately testified at trial for the

12  government, NIEH can fairly and justly be held responsible for the most violent acts engaged in by the

13  CKT.

14      After NIEH, CHOW's closest associates were Leslie YUN and James PAU, who engaged in

15  drug trafficking, money laundering, and trafficking in purportedly stolen cigarettes through the CKT

16  enterprise after CHOW introduced them both to undercover agents.  When YUN's and PAU's apartment

17  was searched on March 26, 2014, agents recovered a number of firearms and ammunition, as well as

18  CKT business cards identifying YUN as "Treasurer" and PAU as "Grand Counsel Director."  PAU in

19  particular explained to undercover agents at length the organizational structure of the CKT, and

20  identified himself as a "415" within the organization, or someone who could order others to engage in

21  violence.  Trial Transcript, v. 11, at 1600-1608.   With respect to YUN, not only was she the CKT's

22  treasurer, but it was at her massage parlor in Oakland where CHOW planned violent acts on behalf of

23  the CKT enterprise.  *See*, *e.g.*, Trial Transcript, v. 20, at 3469[2] and at pg. 3520.[3]

---

24

25  [2] Q: When Mr. Chow talked to you about committing crimes, would he -- we just talk about it
    openly and directly, or did he talk about it in a way of -- Well, how would he talk about -- if he talked to
    you about committing crimes, how would he talk about it?

26

27  A: If it was something casually, he would just talk about it openly; but if it was something more
    serious, he would ask them to go to massage or a sauna -- sauna place, at Leslie's place.

    [3] Q: What did Mr. Chow ask you to do about Allen Leung?

28  A. He told me to coordinate with Raymond Lei and get rid of Allen Leung.

After YUN and PAU, the next closest individual to CHOW was Michael MEI, who fit into the CKT hierarchy as a follower of NIEH, who was, of course, subordinate to CHOW.  MEI told NIEH he was prepared to engage in violence and take care of CHOW's rival, Jim Tat Kong.  MEI discussed with NIEH using violence in order to address a problem with an underling and spoke of always carrying a loaded gun.  Although MEI's criminal conduct was limited mainly to drug trafficking, this Court has already found that he possessed a firearm in connection with such conduct.  Docket No. 1917, Order Re Safety Valve Eligibility, December 1, 2017.

Elaine LIANG is next in terms of relative culpability.  LIANG paid undercover agents to launder $1.6 million in cash from her trafficking proceeds by moving the cash from the East Coast to the Bay Area.  LIANG made these arrangements through CHOW with NIEH as an intermediary, and both CHOW and NIEH benefitted financially from the arrangement when UCE 4599 paid for the privilege of being able to do business with LIANG.

After Elaine LIANG comes Kevin SIU, who was the first person whom CHOW introduced to undercover agents in order to engage in criminal activity, and who engaged briefly in "reverse" money laundering, that is, receiving what were purported cash proceeds of UCE 4599's illegal businesses, and laundering that money through SIU's bank account.  SIU's services to UCE 4599 – from which CHOW again benefitted financially – were terminated by CHOW and NIEH when they suspected SIU was a "rat."  While SIU's period of money laundering was limited, the Court will recall UCE 4599's chilling testimony of his meeting with SIU in a Las Vegas hotel room, where SIU took out a gun, placed it on

---

Q. What does "get rid of Allen Leung" mean to you?

A. Take care of him.

Q. What does "take care of him" mean?

A. Take a hit. Murder him.

Q. Do you recall exactly when that conversation took place?

A. No, I don't recall.

Q. Can you estimate for us, only if you can, around how long before February 27th, 2006, when Mr. Leung was killed did that conversation take place, if you know?

A. Probably, like, two months before he get killed.

Q. Where were you when Mr. Chow asked you to do that?

A. We was in Millennium Massage Parlor.

the table, and proceeded to snort lines of cocaine.  When agents searched SIU's residence on March 26, 2014, they found four firearms and ammunition, as well as a CKT business card identifying SIU as "Assistant Secretary."

Finally, at the outer edges of CHOW's criminal solar system, so to speak, lies co-defendant Alan CHIU, who provided money laundering services to UCE 4599, but was such an inept criminal that he forgot to take his checkbook on one occasion to a money laundering transaction.  CHIU did so at CHOW's direction and stopped when CHOW decided CHIU was not cut out for the job.  CHIU serves as a useful frame of reference for the six soon-to-be-sentenced defendants, since he too was charged in the racketeering conspiracy but pled guilty to substantive offenses, and has already been sentenced. This Court sentenced CHIU to 27 months in custody.

In addition to the six defendants described above, there are three other defendants scheduled for sentencing on January 8, 2018: Tina LIANG, Barry HOUSE, and Rinn ROEUN.  Each of these three defendants is in a slightly different situation when compared to the six described above.  Tina LIANG was charged in the racketeering conspiracy along with the six defendants described above.  However, unlike them, she negotiated a plea agreement with the government in which she pled guilty to drug trafficking and stolen liquor trafficking, in exchange for which the government agreed to dismiss the racketeering charge.   In terms of relative culpability the government places Tina LIANG slightly below co-defendant Elaine LIANG.  Like Elaine LIANG, Tina LIANG was part of a significant marijuana operation and inquired whether undercover agents could help her launder large amounts of cash.  In the end, Tina LIANG engaged in other kinds of criminal conduct, specifically purchasing stolen liquor, and did not engage in the extensive money laundering that Elaine LIANG did.  Thus, the government views Tina LIANG as slightly less culpable than Elaine LIANG.

The remaining two defendants, Barry HOUSE and Rinn ROEUN, were not charged in the racketeering conspiracy.  However, they nevertheless engaged in, and pled guilty to, serious firearms trafficking offenses, and both offered to engage in acts of violence on behalf of undercover agents. Because of the serious nature of their conduct, the government views both HOUSE and ROUEN as more culpable than everyone in the group of nine to be sentenced on January 8, 2018, except NIEH. ROUEN agreed to a murder for hire and was prepared to carry out that murder.  HOUSE offered to

1   perform acts of violence in exchange for business opportunities.  HOUSE has a significant criminal

2   history.  Both ROUEN and HOUSE sold illegal guns to UCE 4599 believing that the guns were going to

3   be used to shoot people robbing UCE 4599's marijuana grows.  Accordingly, both ROUEN and HOUSE

4   should receive substantial sentences that properly reflect the serious nature of the crimes in which they

5   were involved.

6        **D.**    **Downward Variances Recommended by the Probation Officer**

7        In preparing the Presentence Reports for each of the seven RICO defendants, the Probation

8   Officer adopted the analysis discussed above in determining relevant conduct and the base offense level

9   for each defendant.  The Probation Officer determined that there was sufficient evidence to establish that

10  each defendant was a member of and participant in the CKT enterprise and then determined the relevant

11  conduct for which that defendant is responsible by identifying the scope of the jointly undertaken

12  criminal activity that was reasonably foreseeable to that defendant.  For instance, in finding that

13  defendant Leslie YUN participated in a money laundering conspiracy with NIEH, PAU, and CHOW, the

14  Probation Officer found that (1) the scope of YUN's jointly undertaken criminal activity with the

15  enterprise was money laundering; and (2) it was reasonably foreseeable to YUN that other enterprise

16  members were engaging in money laundering.  Therefore, the money laundered by other members of the

17  enterprise was relevant conduct for YUN.

18       The Probation Officer went through a similar analysis for each of the other six RICO defendants

19  and attributed relevant conduct beyond the criminal activity of that particular defendant.  In each

20  instance, the government concurs in the Probation Officer's calculation of the adjusted base offense

21  level for defendants NIEH, YUN, PAU, Elaine LIANG, MEI, SIU, and Tina LIANG.

22       After having made this determination, the Probation Officer is recommending significant across-

23  the-board variances for each of the seven RICO defendants to which the government objects.[4]  For each

24  defendant, the Probation Officer properly engaged in an individualized assessment of that defendant in

25  light of the sentencing criteria set forth in Section 3553(a).  The bases for the variances fall into three

26  general categories.  First, in some instances, the Probation Officer addressed particularized hardships or

27  

28      [4] The government also objects to the variances recommended for defendants ROUEN and HOUSE.

1    other personal circumstances or characteristics of the defendant.  As to those matters, the government

2    addresses those issues in the individual sentencing memorandum.

3        Second, the Probation Officer based the various variance recommendations on the need for the

4    Court to avoid sentencing disparities.  In most instances, the government disagrees with the benchmark

5    that the Probation Officer used for guidance in determining what should be an appropriate sentence for

6    the defendant.  Again, the government addresses those issues in its individualized sentencing

7    memoranda.

8        A third basis for variance appears to be embedded in the Probation Officer's sentencing

9    recommendation; it is a basis to which the government objects and addresses here because it relates to

10   the relevant conduct legal principles addressed above.  That is, although the Probation Officer properly

11   determined relevant conduct based on the reasonably foreseeable acts of others within the scope of the

12   defendant's conduct in the Chow enterprise, the Probation Officer recommends significant variances for

13   every RICO defendant in such a way as to undermine and be inconsistent with the principle of relevant

14   conduct.  For instance, after finding that defendant YUN was accountable, as relevant conduct, for the

15   money laundered by members of the enterprise, *i.e.* over $5 million, the Probation Officer recommends

16   that the sentence should take into account that YUN was only "personally involved in laundering

17   $264,000 of those funds."  As another example, after finding that defendant MEI engaged in drug

18   trafficking as part of participating in the CKT criminal enterprise and basing relevant conduct on all

19   drug trafficking engaged in by other members of the enterprise, the Probation Officer recommends a

20   sentence that takes into account that MEI was "personally responsible" for growing only 1,200

21   marijuana plants.  The Probation Officer takes the same approach with other of the six Count One RICO

22   defendants and for each, ends up recommending a drastically reduced sentence from the applicable

23   sentencing guidelines.

24       The government respectfully disagrees with this basis for a variance because it misunderstands

25   what participating in a RICO conspiracy entails and is inconsistent with the principles of sentencing in

26   the RICO conspiracy context.  The government recognizes that it bears the burden of demonstrating

27   sufficient evidence to establish that each of the seven Count One RICO defendants was a member of and

28   participant in the Chow racketeering enterprise.  It has met that burden in setting forth evidence

1    particularized as to each defendant.  In fact, the government presented a good portion of the evidence of

2    each defendant's relation to and role in the enterprise at the Chow trial.

3           By electing not to plead guilty to the RICO conspiracy charge, each defendant is now striving to

4    present himself or herself as an independent operator who committed discrete crimes entirely separate

5    from the CKT enterprise.  Although the Probation Officer did not follow this approach in determining

6    the relevant conduct and base offense level for each defendant, the Officer ends up supporting the

7    defendant's approach by recommending variances based, at least in part, on the idea that the defendant's

8    sentence should reflect only the illegal acts in which that particular defendant engaged.  That position is

9    not supported by the evidence or the sentencing guidelines, and the defendants should not be permitted

10   to avoid culpability for being a member of the CKT enterprise by now taking the position that they

11   should only be held accountable for the acts in which they personally engaged.

12          As the Ninth Circuit stated in *Barragan*, *supra*, a racketeering conspiracy is a single-object

13   conspiracy and as long as the criminal acts of others were within the scope of a given member's

14   activities and reasonably foreseeable to that defendant, then that defendant must be held accountable for

15   that conduct of other enterprise members.  The defendants here did not engage in a series of mini-

16   conspiracies; they elected to participate in and benefit from the CKT enterprise.  It was the relationship

17   to CHOW and the CKT enterprise that presented the opportunity for lucrative criminal activity.  The

18   RICO defendants who engaged in illegal conduct with UCE 4599 were only able to do so through

19   CHOW's introduction and CHOW's blessing.  The defendants benefitted financially and otherwise from

20   those illegal activities with UCE 4599 and so did CHOW.  CHOW received money from UCE 4599 for

21   being able to do business with CHOW's associates.  More importantly, perhaps, by trading on and

22   benefitting from their connection to CHOW, each defendant helped perpetuate CHOW's power and

23   status as the head of the CKT criminal enterprise.  As such, the law provides that the sentences for these

24   defendants should reflect the true scope of the criminal enterprise in which they agreed to participate,

25

26

27

28

1   and should not be minimized so as to suggest that their culpability is limited.[5]

2   DATE: December 8, 2018                         Respectfully submitted,

3                                                 BRIAN J. STRETCH
                                                  United States Attorney

4                                                 _____
                                                          /s/
5                                                 WILLIAM FRENTZEN
                                                  SUSAN E. BADGER
6                                                 S. WAQAR HASIB
                                                  Assistant United States Attorneys

7

8

9

10

11

12

13

14

15

16

17

18   _____
         [5] For the convenience of the Court, the status of the other Count One RICO defendants is as
19   follows:  CHOW, of course, was found guilty of all the charges against him and the Court sentenced
     CHOW to life in prison.  Keith JACKSON pled guilty to the Count Two RICO (with Leland YEE) and
20   the Court sentenced JACKSON to 108 months in custody (his guideline range was 135 – 168 months).
     Kongphet CHANTHAVONG has pled guilty to the Count One RICO pursuant to a cooperation plea
21   agreement with the government, testified at the CHOW trial, and is awaiting sentencing.  The Probation
     Office has not yet prepared the PSR for CHANTHAVONG.  Defendant Brandon JACKSON pled guilty
22   to the Coune One RICO pursuant to a plea agreement with the government, and this Court sentenced
     him 54 months in custody.  (Brandon JACKSON's guideline range was 121-151 months.  Pursuant to
23   the plea agreement, the government recommended a sentence of 72 months).  Defendant Marlon
     SULLIVAN pled guilty to the Count One RICO pursuant to a plea agreement with the government, and
24   this Court sentenced SULLIVAN to serve a term of 66 months.  (SULLIVAN's guideline range was
     121-151 months.  Pursuant to the plea agreement, the government recommended a sentence of 84
25   months).  Andy LI has pled guilty to the Count One RICO pursuant to a cooperation plea agreement
     with the government, testified at the CHOW trial, and is awaiting sentencing.  The Probation Office has
26   not yet prepared the PSR for LI.  Ming MA pled guilty, pursuant to a plea agreement with the
     government, to one count of receiving stolen goods and the Court sentenced Ma to 3 months in custody.
27   (The government recommended a sentence of 11 months.  Defendant Albert NHINGSAVATH pled
     guilty to the Count One RICO pursuant to a cooperation plea agreement with the government, testified
28   at the CHOW trial, and is awaiting sentencing.  The Probation Office has not yet prepared the PSR.
     Defendant Serge GEE is a fugitive.